819 N.E.2d 1133 (2004)
354 Ill. App.3d 57
289 Ill.Dec. 333
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Marcus BUTLER, Defendant-Appellant.
No. 1-03-1978.
Appellate Court of Illinois, First District, Third Division.
November 17, 2004.
*1134 Michael Pelletier, Deputy Defender, Chicago (Lisa Rousso, Assistant Appellate Defender, of counsel), for Appellant.
Richard A. Devine, State's Attorney, Chicago (Renee Goldfarb, Veronica C. Malavia, Sally Dilgart & Jamieson Bowman, Assistant State's Attorneys, of counsel), for Appellees.
Justice HOFFMAN delivered the opinion of the court:
Following a bench trial, the defendant, Marcus Butler, was convicted of retail theft of merchandise valued in excess of *1135 $150 (720 ILCS 5/16A-3(a) (West 2002)) and aggravated battery of a merchant (720 ILCS 5/12-4(b)(15) (West 2002)). He was sentenced to concurrent terms of five years' imprisonment. The circuit court also ordered the defendant to submit a biological sample for genetic marker testing pursuant to section 5-4-3 of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5-4-3 (West 2002)). On appeal, the defendant contends that: (1) the State failed to prove him guilty of aggravated battery beyond a reasonable doubt; (2) section 16A-4 of the retail theft statute (720 ILCS 5/16A-4 (West 2002)) is unconstitutional because it contains a mandatory presumption that relieves the State of its burden to prove the element of intent beyond a reasonable doubt; (3) section 5-4-3 of the Code of Corrections is unconstitutional as applied because it constitutes a search without any individualized suspicion of criminal wrongdoing; and (4) the mittimus should be corrected to reflect the proper credit for time served prior to sentencing. For the reasons which follow, we affirm the defendant's convictions and sentence, and order the mittimus corrected.
The State presented the following evidence at trial. Daniel Keippel testified that, on September 13, 2002, at approximately 11 a.m., he was employed as the manager of a Walgreen's store at Fullerton and Central Avenues in Chicago. While standing near the front of the store, Keippel noticed the defendant enter the store holding a folded Walgreen's shopping bag in his hand. Keippel followed the defendant towards the back of the store where he observed him "shoveling" numerous items into the bag. The defendant then walked towards the front of the store and past several check-out registers. When the defendant approached the front door, Keippel stepped in front of him and said, "[S]ir, you need to give us the items back. You are not leaving with the bag." The defendant responded by taking a "swing" at Keippel, which missed, and then attempting to push his way out of the store. Keippel held onto the defendant and the two men fell to the ground and began to wrestle. While wrestling, the defendant struck Keippel "more than once" before an assistant manager aided Keippel in subduing the defendant until the police arrived. Keippel testified that, although he felt the defendant's punches and fell onto ceramic tiles, he did not receive any "injuries." However, Chicago police officer Barry Eichner testified that, after arriving at the Walgreen's store, he noticed that Keippel had contusions on his face. Keippel also testified that he recovered the Walgreen's shopping bag which the defendant had filled with merchandise valued in excess of $400.
The defendant testified that, on September 13, 2002, he was standing approximately 25 feet from the front door of the Walgreen's store when he was approached by two men. One of the men, who the defendant believed to be the manager, grabbed him by the shirt and told him to come to the back of the store. The defendant resisted and eventually wound up wrestling with the two men for about two minutes before the police arrived and placed him under arrest. The defendant claimed that the items he was charged with stealing were knocked off their shelves during the scuffle and that he never attempted to leave the store without paying for the merchandise.
In rebuttal, the State introduced evidence of the defendant's prior felony and misdemeanor convictions. Following arguments, the trial judge found the defendant guilty of retail theft of merchandise valued in excess of $150 and aggravated battery of a merchant. The judge commented that, even absent evidence of his prior *1136 convictions, the defendant's testimony was unbelievable.
The defendant filed a motion for a new trial, which the circuit court denied, and he was sentenced to concurrent terms of five years' imprisonment. The circuit court also ordered the defendant to submit a biological sample for genetic marker testing, and denied the defendant's motion to declare section 5-4-3 of the Code of Corrections unconstitutional. This timely appeal followed.
The defendant first argues that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery of a merchant. In resolving this issue, we must view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Pollock, 202 Ill.2d 189, 217, 269 Ill.Dec. 197, 780 N.E.2d 669 (2002); see also People v. Cox, 195 Ill.2d 378, 387, 254 Ill.Dec. 720, 748 N.E.2d 166 (2001).
Section 12-4(b)(15) of the Criminal Code of 1961 (Code) (720 ILCS 5/12-4(b)(15) (West 2002)) provides that a person commits the offense of aggravated battery when, in committing a battery, he or she "[k]nowingly and without legal justification and by any means causes bodily harm to a merchant who detains the person for an alleged commission of a retail theft." The defendant, citing People v. Fuller, 159 Ill.App.3d 441, 111 Ill.Dec. 443, 512 N.E.2d 832 (1987), contends that Keippel's own testimony precludes a finding that he suffered bodily harm within the meaning of the statute. We disagree.
In Fuller, the victim, a police officer, testified at trial that he was not injured "in any way" as a result of his physical encounter with the defendant. On appeal from the defendant's conviction for battery, the Fuller court reversed, finding that, based upon the officer's testimony and the lack of any other evidence, the State had failed to prove beyond a reasonable doubt that the officer sustained actual bodily harm. However, in this case, unlike in Fuller, the State presented testimony that the defendant caused bodily harm to the victim.
Our supreme court has stated that, while "it may be difficult to pinpoint exactly what constitutes bodily harm for the purposes of the statute, some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent, is required." People v. Mays, 91 Ill.2d 251, 256, 62 Ill.Dec. 945, 437 N.E.2d 633 (1982). At trial, Keippel testified that the defendant struck him numerous times while attempting to flee the store and that he "felt" the punches. Keippel also stated that, when he and the defendant started to wrestle, they fell to the ground and onto ceramic tiles. Although Keippel testified that he did not receive any "injuries" from this physical contact, Officer Eichner testified that he observed "contusions" on Keippel's face. We find that the evidence, when viewed as a whole and in a light most favorable to the State, shows that the defendant's actions caused Keippel bodily harm within the meaning of section 12-4(b)(15) of the Code.
Next, the defendant contends that section 16A-4 of the retail theft statute (720 ILCS 5/16A-4 (West 2002)) is unconstitutional. Specifically, he asserts that the mandatory presumption contained in the statute relieves the State of its burden to prove the element of intent to commit the offense of retail theft beyond a reasonable doubt and, as a consequence, violates the due process clause of the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV). We recently *1137 addressed precisely this issue in People v. Taylor, 344 Ill.App.3d 929, 936-37, 280 Ill.Dec. 60, 801 N.E.2d 1005 (2003), and found that, although section 16A-4's mandatory presumption is unconstitutional, it is nevertheless severable from the remainder of the retail theft statute and, as a consequence, a conviction for retail theft should not be reversed when the record is devoid of any showing that the trial judge relied on the presumption.
We reaffirm our earlier determination that the mandatory presumption contained in section 16A-4 is unconstitutional (see Taylor, 344 Ill.App.3d at 936, 280 Ill.Dec. 60, 801 N.E.2d 1005), but again find that reversal is unwarranted. The record in this case, as in Taylor, reveals no reference to the presumption. The State never relied upon the presumption or argued its application, and the trial judge did not refer to the presumption in finding the defendant guilty of retail theft. A trial judge is presumed to know the law (People v. McCoy, 207 Ill.2d 352, 357, 278 Ill.Dec. 551, 799 N.E.2d 269 (2003)); and, just as in Taylor, we assume that the judge in this case was aware that application of the mandatory presumption set forth in section 16A-4 had been held unconstitutional (see People v. Martin, 86 Ill.App.3d 77, 41 Ill.Dec. 501, 407 N.E.2d 999 (1980); People v. Flowers, 134 Ill.App.3d 324, 89 Ill.Dec. 312, 480 N.E.2d 198 (1985); People v. Dodd, 173 Ill.App.3d 460, 123 Ill.Dec. 441, 527 N.E.2d 1079 (1988)). The record in this case convinces us that the trial judge found the defendant possessed the requisite mental state for the commission of retail theft from the surrounding circumstances, and that this decision was not based on the application of any statutory presumption.
The defendant next argues that section 5-4-3 of the Code of Corrections, which provides for the extraction of a biological sample for genetic marker testing, is unconstitutional as applied to individuals, such as him, who have not been convicted of a sexual offense. The defendant contends that, in the absence of any suspicion of criminal wrongdoing on his part, section 5-4-3 violates his right to be free from unreasonable searches and seizures as guaranteed by the fourth amendment to the United States Constitution (U.S. Const., amend. IV), and article I, section 6, of the Illinois Constitution (Ill. Const.1970, art. I, § 6). Again, we disagree.
Both of the crimes for which the defendant was convicted are felonies. See 720 ILCS 5/16A-10(3) (West 2002) and 720 ILCS 5/12-4(e) (West 2002). At the time of the defendant's convictions and sentence, section 5-4-3 of the Code of Corrections provided, in relevant part, as follows:
"Any person who was otherwise convicted of or received a disposition of court supervision for * * * any offense classified as a felony under Illinois law * * * may, regardless of the sentence imposed, be required by an order of the court to submit specimens of blood to the Illinois Department of State Police in accordance with the provisions of this Section." 730 ILCS 5/5-4-3(a-5) (West 2002).[1]
As the parties correctly agree, the extraction and testing of a biological sample from an individual implicates the fourth amendment (see Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)), the *1138 purpose of which is to ensure "privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their discretion" (Skinner, 489 U.S. at 613-14, 109 S.Ct. 1402). Under the fourth amendment, all searches and seizures must be reasonable. City of Indianapolis v. Edmond, 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). Reasonableness, as the Supreme Court has explained, ordinarily requires the obtaining of a judicial warrant based upon a showing of probable cause. Vernonia School District 47J v. Acton, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). "But a warrant is not required to establish the reasonableness of all government searches; and when a warrant is not required (and the Warrant Clause therefore not applicable), probable cause is not invariably required either." Acton, 515 U.S. at 653, 115 S.Ct. 2386 (emphasis in original).
All 50 states and the federal government have adopted genetic marker testing and storage statutes similar to the one at issue here. See statutes cited in People v. Garvin, 349 Ill.App.3d 845, 853-54, 285 Ill.Dec. 953, 812 N.E.2d 773 (2004). Fourth Amendment challenges to these statutes have been unsuccessful in both state and federal courts.[2] See cases cited in Vore v. United States Department of Justice, 281 F.Supp.2d 1129, 1134 (D.Ariz.2003) and Garvin, 349 Ill.App.3d at 854, 285 Ill.Dec. 953, 812 N.E.2d 773; but see United States v. Miles, 228 F.Supp.2d 1130 (E.D.Cal.2002). Several recent challenges to the version of section 5-4-3 we are reviewing have likewise failed. See People v. Edwards, ___ Ill.App.3d ___, 288 Ill.Dec. 879, 818 N.E.2d 814 (2004); People v. Peppers, 352 Ill.App.3d 1002, 288 Ill.Dec. 502, 817 N.E.2d 1152 (2004); People v. Ramos, slip op. at 35, 353 Ill.App.3d 133, ___, 288 Ill.Dec. 460, 817 N.E.2d 1110 (2004) (plurality opinion); People v. Hall, 352 Ill.App.3d 537, 287 Ill.Dec. 736, 816 N.E.2d 703 (2004); Garvin, 349 Ill.App.3d 845, 285 Ill.Dec. 953, 812 N.E.2d 773. However, as was observed in Peppers, while reviewing courts agree that these genetic marker testing and storage statutes are constitutional, they do not agree on the appropriate analysis to be employed in evaluating their constitutionality. Peppers, 352 Ill.App.3d at 1004-05, 288 Ill.Dec. 502, 817 N.E.2d 1152 (2004). Some courts have utilized a "special needs" test, while others have applied a balancing test. See Edwards, slip op. at 4, ___ Ill.App.3d at ___, 288 Ill.Dec. 879, 818 N.E.2d 814 (2004). We believe that the balancing test is the appropriate analytical approach.
In United States v. Kincade, 379 F.3d 813 (9th Cir.2004), the court conducted an in depth examination of the Supreme Court's development and utilization of the "special needs" doctrine. The court began its examination by noting the circumstances under which the Supreme Court had utilized the "special needs" approach, observing that the Court's most recent *1139 "special needs" cases have focused on whether the primary purpose or immediate objective of a warrantless search was to detect evidence of ordinary criminal wrongdoing in the individual being searched. Kincade, 379 F.3d at 825-26; see, e.g., Illinois v. Lidster, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (upholding an information-seeking highway checkpoint program designed to solicit the public's assistance in investigating a recent crime committed by others); Board of Education v. Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (upholding a program that subjected all students participating in extracurricular activities to submit to random, suspicionless drug testing); Ferguson v. Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (invalidating a state hospital's program of non-consensual drug testing of maternity patients for law enforcement purposes); Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (invalidating a vehicle checkpoint program whose purpose was the interdiction of unlawful drugs); Chandler v. Miller, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (invalidating a statute requiring candidates for political office to undergo a urinalyses drug test); Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (upholding random drug testing of student-athletes); National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding drug testing of United States Customs Service employees seeking certain transfers or promotions); Skinner, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (upholding drug testing of railway employees involved in train accidents or found to be in violation of particular safety regulations); Griffin v. Wisconsin, 483 U.S. 868, 880, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (upholding a warrantless probation-related search of a probationer's residence). The Kincade court then remarked that, while the Supreme Court may seem to be moving towards a requirement that any search conducted primarily for law enforcement purposes be accompanied by some level of individualized suspicion of wrongdoing, the Court signaled the existence of possible limitations in United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).
In Knights, the defendant challenged a warrantless search of his residence which was supported by a reasonable suspicion of criminal wrongdoing and authorized by a probation condition. The defendant argued that the search of his residence, which was executed by law enforcement officials for law enforcement purposes, was impermissible because, in Griffin, the Court had sanctioned only warrantless, probationary searches undertaken for non-law enforcement purposes. After rejecting the defendant's "dubious logic * * * that an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it," the Court examined the reasonableness of the search by balancing the invasion of the defendant's interest in privacy against the State's interest in searching his home without a warrant supported by probable cause. Knights, 534 U.S. at 117-21, 122 S.Ct. 587.
Based in large part on Knights, the Kincade court held that utilization of a traditional fourth amendment balancing test to uphold genetic marker testing of convicted offenders "both comports with the Supreme Court's recent precedents and resolves this appeal in concert with the requirements of the Fourth Amendment." Kincade, 379 F.3d at 832. In so holding, the court presented the following reasoning:
"As we have stressed, neither Edmond nor Ferguson condemns suspicionless searches of conditional releasees in the *1140 absence of a demonstrable `special need' apart from law enforcement. Indeed, Ferguson explicitly distinguished itself from cases addressing the constitutionality of parole and probation searches  thus recognizing a constitutionally significant distinction between searches of conditional releasees and searches of the general public, and laying the framework for a jurisprudentially sound analytic division between these two classes of suspicionless searches. [Citation.] And Knights, of course, affirmed the post-Edmond, post-Ferguson possibility that conditional releasees' diminished expectations of privacy may be sufficient to justify the judicial assessment of a parole or probation search's reasonableness outside the strictures of special needs analysis. [Citation.]" Kincade, 379 F.3d at 832.
We find the Kincade court's reasoning to be persuasive and, like the Kincade court, recognize the important distinction between those cases addressing the constitutionality of warrantless searches of individuals with diminished expectations of privacy, such as prisoners, probationers, and parolees, and warrantless searches of the general public. In the recent cases where the Supreme Court has applied the "special needs" doctrine, the program or policy at issue was designed to effect members of the general public, not those with diminished expectations of privacy.[3]Knights emphasized this distinction in holding that a probationer's diminished expectations of privacy were sufficient to justify a warrantless search outside the framework of the "special needs" analysis. The defendant in this case, as a convicted felon, was subject to a sentence of imprisonment, probation, or conditional discharge. See 730 ILCS 5/5-5-3(b) (West 2002). Thus, we believe that he falls into that category of individuals whose diminished expectations of privacy are sufficient to justify the reasonableness of a search or seizure outside the strictures of the "special needs" analysis. See also Ramos, slip op. at 28-29, 353 Ill.App.3d at ___-___, 288 Ill.Dec. 460, 817 N.E.2d 1110 (2004); and Hall, 352 Ill.App.3d at 545-46, 287 Ill.Dec. 736, 816 N.E.2d 703; but see Ramos, slip op. at 31, 353 Ill.App.3d at ___, 288 Ill.Dec. 460, 817 N.E.2d 1110 (2004) (Theis, J., specially concurring) (advocating for utilization of "special needs" doctrine).
Having determined the proper approach, we now apply the test by balancing the government's interest in establishing a data bank of genetic identity against the defendant's expectation of privacy and the gravity of the intrusion in order to determine whether the application of section 5-4-3 to the defendant violates his fourth amendment rights.
Beginning with the interests furthered by section 5-4-3, we agree with the State that it has a legitimate interest in establishing and preserving a reliable source of identification of convicted felons in order to contribute to the creation of a more accurate criminal justice system. See Ramos, *1141 slip op. at 29, 353 Ill.App.3d at ___, 288 Ill.Dec. 460, 817 N.E.2d 1110 (2004); Garvin, 349 Ill.App.3d at 855, 285 Ill.Dec. 953, 812 N.E.2d 773. Further, the great precision afforded by genetic marker collection and identification is closely related to the State's interest in deterring and prosecuting recidivist criminal acts. See Ramos, slip op. at 29, 353 Ill.App.3d at ___, 288 Ill.Dec. 460, 817 N.E.2d 1110 (2004); Hall, 352 Ill.App.3d at 546-47, 287 Ill.Dec. 736, 816 N.E.2d 703 (2004). By developing a reliable genetic profile database, section 5-4-3 also serves to both "absolve the innocent" and "bring closure to countless victims of crime who have long languished in the knowledge that perpetrators remain at large." Kincade, 379 F.3d at 839; see also Ramos, slip op. at 29, 353 Ill.App.3d at ___, 288 Ill.Dec. 460, 817 N.E.2d 1110 (2004).
Regarding the defendant's expectations of privacy, we return to the well-established principle that convicted felons have diminished expectations of privacy under the fourth amendment. Garvin, 349 Ill.App.3d at 855, 285 Ill.Dec. 953, 812 N.E.2d 773, citing Griffin, 483 U.S. at 880, 107 S.Ct. 3164. Moreover, while the defendant, as a lawfully incarcerated individual, did "not shed all constitutional rights at the prison gate," his status as a prisoner has brought "about the necessary withdrawal or limitation of many privileges and rights." Sandin v. Conner, 515 U.S. 472, 485, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). See also McKune v. Lile, 536 U.S. 24, 36, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) ("A broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions of confinement of those who have suffered a lawful conviction.")
As to the intrusive nature of the search, the Supreme Court has determined that the extraction of blood samples for testing is "commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." Schmerber, 384 U.S. at 771, 86 S.Ct. 1826. "The blood test procedure has become routine in our everyday life." Schmerber, 384 U.S. at 771 n. 13, 86 S.Ct. 1826, citing Breithaupt v. Abram, 352 U.S. 432, 436, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). Accordingly, courts considering fourth amendment challenges have determined that the extraction of blood samples for genetic testing involves only a minimal invasion. See, e.g., Garvin, 349 Ill.App.3d at 856, 285 Ill.Dec. 953, 812 N.E.2d 773; Gaines, 116 Nev. at 370, 998 P.2d 166. As the court in Garvin noted, "the physical intrusion imposed by the DNA testing mandated by section 5-4-3 of the Code of Corrections `is relatively slight and poses no threat to the health or safety of the individual tested.' [Citation.]." Garvin, 349 Ill.App.3d at 856, 285 Ill.Dec. 953, 812 N.E.2d 773.
The defendant argues, however, that because "genetic pattern analysis catalogs uniquely private genetic facts about the individual, which go well beyond the mere identifying mark of a fingerprint, the invasion into [his] privacy is increased." We disagree. Section 5-4-3 provides that convicted felons may be required to submit blood specimens which will be forwarded to the Illinois Department of State Police for "analysis and categorizing into genetic marker groupings." 730 ILCS 5/5-4-3(d) (West 2002). Nowhere in section 5-4-3 is the gathering of "uniquely private genetic facts" authorized. Further, the statute provides that the information obtained shall be confidential and released only to peace officers and prosecutorial agencies. 730 ILCS 5/5-4-3(f) (West 2002).
*1142 The defendant also asserts that the discretion allowed under section 5-4-3(a-5) may lead to a circuit court applying the program in an arbitrary or oppressive fashion which, therefore, weighs against its reasonableness. However, this argument is undeveloped and the defendant failed to cite any supporting authority. As a consequence, the argument is waived. See Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001.
Finally, the defendant claims that, while section 5-4-3 may be reasonable as applied to violent or sexual offenders, it is unreasonable as applied in the context of a "non-sexual case" because "there is virtually no chance that DNA evidence would be involved in the investigation or prosecution of similar cases in the future." Once again, we disagree. Regardless of the felony committed, the data bank of genetic identity created by section 5-4-3 not only assists in the prosecution of recidivist criminals, it provides a reliable means to identify individuals (see Edwards, slip op. at 9-10, 353 Ill.App.3d at ___-___, 288 Ill.Dec. 879, 818 N.E.2d 814 (2004)) and, as noted earlier, assists in absolving the innocent.
In conclusion, after balancing the minimal intrusion into a felon's privacy interests against the State's compelling interests in correctly identifying offenders, solving past and future crimes, and deterring and prosecuting recidivist criminal acts, we find that the genetic testing authorized by section 5-4-3 does not violate the fourth amendment.
The defendant also argues that section 5-4-3 is unconstitutional under article I, section 6, of the Illinois Constitution (Ill. Const.1970, art. I, § 6). The defendant contends that the privacy clause of article I, section 6, affords him even greater protection from unreasonable searches and seizures than the fourth amendment. We disagree.
In People v. Bolden, 197 Ill.2d 166, 258 Ill.Dec. 538, 756 N.E.2d 812 (2001), the defendant similarly argued that article I, section 6, must be interpreted more broadly than its federal constitutional analogue. In rejecting this argument, our supreme court focused on the difference between the search and seizure clauses of the federal and state Constitutions, and the privacy clause, which is unique to our state constitution, and concluded that:
"Decisions of this court have long understood the search and seizure clause of article I, section 6, to command an interpretation like the one that is given to the corresponding provision of the fourth amendment. [Citations.] While the privacy clause of article I, section 6, possesses a unique constitutional history, it is of no assistance here to the defendant, for it is a separate guarantee and does not serve to transform the nearby search and seizure clause into a source of constitutional rights that are more extensive than those conferred by the fourth amendment." Bolden, 197 Ill.2d at 179, 258 Ill.Dec. 538, 756 N.E.2d 812.
Accordingly, in determining whether section 5-4-3 constitutes an impermissible search and seizure under article I, section 6, of the Illinois Constitution, we shall look to the Supreme Court's interpretation of the corresponding provision of the fourth amendment. See Bolden, 197 Ill.2d at 179, 258 Ill.Dec. 538, 756 N.E.2d 812; People v. Bull, 185 Ill.2d 179, 196, 235 Ill.Dec. 641, 705 N.E.2d 824 (1998); Fink, 174 Ill.2d at 314, 220 Ill.Dec. 369, 673 N.E.2d 281. Because we have already determined that section 5-4-3 does not violate the fourth amendment of the United States Constitution, we believe that it also comports with the search and seizure provision of article I, section 6, of the Illinois Constitution.
*1143 Finally, the defendant contends that his mittimus should be corrected to reflect the proper credit for time served prior to sentencing. The defendant was in custody from the time of his arrest on September 13, 2002, until his sentencing on May 12, 2003. Therefore, the defendant was entitled to 242, not 241, days of credit. Accordingly, we direct the clerk of the circuit court to amend the mittimus to reflect the proper number of days of credit. See 134 Ill.2d R. 615(b)(1); People v. McCray, 273 Ill.App.3d 396, 403, 210 Ill.Dec. 438, 653 N.E.2d 25 (1995).
For the foregoing reasons, we affirm the judgment of the circuit court and order the clerk of the circuit court to amend the mittimus to reflect 242 days of credit.
Affirmed; mittimus corrected.
KARNEZIS, P.J., and HARTMAN, J., concur.
NOTES
[1] Section 5-4-3 has most recently been amended to read that any person convicted of any offense classified as a felony "shall" be required to submit specimens of blood, saliva or tissue. 730 ILCS 5/5-4-3(a)(3.5) (West 2004).
[2] In Illinois, a predecessor to the version of section 5-4-3 at issue (730 ILCS 5/5-4-3 (West 1992)), which required genetic marker testing only of convicted sex offenders, has withstood fourth amendment (People v. Calahan, 272 Ill.App.3d 293, 208 Ill.Dec. 532, 649 N.E.2d 588 (1995); People v. Wealer, 264 Ill.App.3d 6, 201 Ill.Dec. 697, 636 N.E.2d 1129 (1994)), due process and ex post facto constitutional challenges (Doe v. Gainer, 162 Ill.2d 15, 204 Ill.Dec. 652, 642 N.E.2d 114 (1994)). Further, a more recent version of section 5-4-3 (730 ILCS 5/5-4-3 (West 2000)) has also been held constitutional as applied to individuals found delinquent under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 2000)) for a qualifying offense under section 5-4-3(g)(1) of the Code of Corrections (730 ILCS 5/5-4-3(g)(1) (West 2000)). In re Robert K., 336 Ill.App.3d 867, 271 Ill.Dec. 630, 785 N.E.2d 562 (2003).
[3] We recognize that the Supreme Court utilized a "special needs" analysis to uphold the statute at issue in Griffin, a case which dealt with the fourth amendment rights of parolees. We believe, however, that the Court's recent cases, most notably Knights, make clear the distinction between individuals who suffer from diminished expectations of privacy (i.e. those on probation, parole, conditional release or, like the defendant, imprisoned), and the general public. It appears that only in the later category must a court engage in a "special needs" analysis. Since Griffin, which was handed down more than 17 years ago at the early stages of the Supreme Court's "special needs" analytical development, the Court has not applied the "special needs" doctrine outside the context of a case dealing with the general public.